# TERRITORY OF HAWAII v. ANACLITO GAGARIN.

## No. 2454.

ARGUED APRIL 30, 1941.                    DECIDED JUNE 10, 1941.

COKE, C. J., PETERS AND KEMP, JJ.

OPINION OF THE COURT BY KEMP, J.

The defendant, Anaclito Gagarin, was found guilty by a jury of murder in the first degree and was by the court sentenced to death for the slaying of Estol Lannom. Defendant's motion for a new trial having been denied by the trial court, he thereafter, within the time allowed by law, brought the case to this court for review on writ of error and seeks to have a new trial ordered, urging two grounds therefor. Defendant has assigned as error the admission in evidence of a written, signed statement made by defendant to police officers a few hours after his arrest. The record fails to show, however, that any objection was made or exception noted to the reception in evidence of the statement. It does appear that when the prosecution was introducing evidence to identify the document, an objection was made to the effect that the document did not contain the exact words used by the defendant. This was before the reporter who took down the statement in shorthand and typed it from his notes and the interpreter who read it to defendant in English and translated it into Ilocano had testified. After these witnesses had testified (the reporter to the effect that the document contained the exact words used by the defendant and the interpreter to the correctness of the reading, translation and signing of the document) it was offered in evidence. Before the court acted upon the offer, the defendant and his counsel were permitted to examine it, with the assistance of the official interpreter. The examination having been completed, defendant's counsel said: "All right. You shouldn't have signed it." Nothing further being said, the court ordered that the document be received in evidence and marked "Prosecution's Exhibit 9." It was then, without objection or exception, read to the jury.

Errors are raised by objection and preserved by taking exception. The ground of the objection should ordinarily

be specified. Then, if the defendant takes an appeal, when the case reaches this court his specification of errors can be presented in a logical, orderly fashion, and should be supported by a brief containing argument and authority. When these steps have been taken, the appellant's right to have the alleged errors passed upon cannot be questioned. But, except as otherwise provided by statute, this court will refuse to consider errors not raised and preserved below. Moreover, section 3563, R. L. H. 1935, provides, *inter alia,* "Nor shall there be a reversal in any term case * * * for any alleged error in the admission or rejection of evidence * * * unless such alleged error was made the subject of an exception noted at the time it was committed." There being no exception noted to the ruling of the court permitting the statement to be received as an exhibit and read to the jury, we are not at liberty to consider the assignment of error complaining of its admission in evidence. We might say, however, that it abundantly appears from the record that the evidence in question was properly received and, even if we were at liberty to consider the assignment of error, we would have to overrule it.

The only other error assigned is to the effect that the evidence is insufficient to sustain the verdict, judgment and sentence.

This being a case in which there is a sentence to death, we would be compelled to review the evidence to determine if the interests of justice require a new trial, whether the insufficiency thereof was assigned as error or not. This duty is imposed upon us by section 3563, R. L. H. 1935, which provides in part as follows: "In case of a sentence to death, the court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is assigned as error or not."

The foregoing provision was incorporated in the statute in 1931. The question of whether or not the quoted provision of the statute imposes upon this court the duty to require a higher degree of proof, in order to sustain a verdict in a capital case than is required to sustain a verdict in a noncapital case, has been raised and argued. This question has not heretofore been considered by this court. The only direct reference by this court to the quoted provisions of the statute coming to our attention appears in the concurring opinion of Mr. Justice Banks in *Ter.* v. *Corum,* 34 Haw. 186, 187, where he said: "The failure of his counsel to move for a mistrial upon the exclusion [*sic*] of the evidence which was improperly received should not be construed as a waiver or abandonment of this right. The duty of the court to grant a new trial (in case of a sentence to death) when upon a review of the evidence it appears that the interests of justice requires it is imposed by section 3563, R. L. 1935, in the following language: [Here follows the language quoted above.]" Mr. Justice Banks was clearly confronted with and was considering a different problem from the one now under consideration and therefore does not aid us in the solution of our problem.

In order to ascertain the legislative intent the statute must be considered as a whole and all of its provisions given effect. The primary intention of the legislature, clearly expressed by the foregoing language, was to require this court in considering capital cases to relax the rule theretofore firmly established by judicial precedent that errors not assigned would not be considered, and review the evidence, whether the insufficiency thereof was assigned as error or not. The singling out of capital cases for special treatment evidences a greater solicitude on the part of the legislature for defendants sentenced to death than for those not so sentenced. However, the legis-

lature apparently anticipated that the language quoted might be held to require the court to weigh the evidence in capital cases and determine the issue on such evidence as it found to be credible and of the greater weight, without regard to the conclusion of the jury in that regard as evidenced by the verdict. To avoid the possibility of such a construction being given the general language quoted, the legislature, by the same Act, provided: "Nor shall there be a reversal in any term case * * * for any finding depending on the credibility of witnesses or the weight of the evidence." This specific provision clearly indicates that it was not the legislative intent that we should usurp the function of the jury by attempting to pass upon the credibility of witnesses or the weight of evidence. The only clear legislative mandate which we can find in the language used is that, without usurping the function of the jury by passing on the credibility of witnesses and the weight of the evidence, we are to review the evidence regardless of the diligence or lack of diligence of the defendant and his counsel in raising the question of the sufficiency of the evidence in the trial court or in this court and determine from that review whether the interests of justice require a new trial.

Obviously, the interests of justice do not require a new trial if the defendant has been given a fair and impartial trial and if there was substantial, competent evidence before the jury from which reasonable men, acting conscientiously and with a desire to arrive at the truth and do justice, could believe beyond a reasonable doubt that all of the elements of the crime charged were established. The jury has said by its verdict that it believed the defendant guilty beyond a reasonable doubt, and in denying defendant's motion for a new trial the circuit judge expressed his view of the sufficiency of the evidence in the following language: "I do not think I need any argument.

The Court has listened to the evidence. The jury's verdict was, in the Court's opinion, amply sustained by the evidence. I don't think that man was telling the truth. He did not start out to tell the truth. He certainly went back and got that knife and came back downtown, went back to the place where this thing happened. The jury can well remember all the circumstances in this case and from the evidence in the case can unquestionably discount his statement that he was looking for this man to take him to the hospital. It is not the first whittling job he has done in this Territory. He is inclined that way and this time he carried it out. The motion will be denied."

We find nothing in the statute requiring a higher degree of proof to uphold a conviction and sentence to death than is required to uphold a conviction and sentence to prison. In either case the evidence must convince the jury beyond a reasonable doubt. No new standard for our guidance in determining whether the interests of justice require a new trial was prescribed by the legislature. We therefore conclude that the applicable principles announced by this court, both before and since the enactment of the statute in question, apply to capital cases as well as to noncapital cases. We are simply required to review the evidence and presumably apply established principles to determine whether the interests of justice require a new trial.

What will and what will not justify this court in setting aside the verdict of a jury and ordering a new trial has been stated by this court many times. The following quotations will suffice to set forth what this court has laid down as the test of the sufficiency of the evidence to sustain the verdict of the jury:

"If the verdict is so manifestly against the evidence as to induce the conviction that a mistake has been made or that injustice has been done or where it appears that the

verdict is clearly, palpably, decidedly and strongly against the evidence or is manifestly the result of bias or of misunderstanding on the part of the jury the verdict should be set aside." *Ter.* v. *Nishi,* 24 Haw. 677, 678. "If there was any substantial evidence from which reasonable men, acting conscientiously and with a desire to arrive at the truth and to do justice, could reasonably find that Peter Louis' servant, the driver of the Cadillac automobile, was negligent, that his negligence was the proximate cause of the collision and the resulting damage, and that Maggie Victor's servant, the driver of the Moreland truck, was free from negligence contributing to the collision and the injury, then the verdicts must be allowed to stand." *Louis* v. *Victor,* 27 Haw. 262, 264. "For many years past it has been clearly established as the law of this jurisdiction that, whether in a criminal case or in a civil suit, a verdict cannot be set aside by this court merely on the ground that it is against the weight of the evidence and it must be upheld and a new trial refused if there is any substantial evidence, more than a mere scintilla, tending to support the findings necessary to the verdict rendered. Citations of Hawaiian cases on this point ought to be no longer necessary. The statute relating to writs of error (§ 2536, R. L. 1925, as amended by Act 42, L. 1931) expressly declares that there shall not be a reversal 'for any finding depending on the credibility of witnesses or the weight of the evidence.'" *Ter.* v. *Young,* 32 Haw. 628, 634.

With the foregoing principles in mind, we proceed to a review of the evidence.

On December 30, 1939, at about eleven o'clock in the evening, the defendant was attacked and cut on the arm by one of several persons who were engaged in a fight in front of the Mint Cafe, on Nuuanu street, in Honolulu. The defendant was then unarmed and his assailant was unknown to him. The defendant ran away from his as-

sailant, procured a taxi and went home. He there changed his clothes, bound his wound, armed himself with a knife, and went back uptown on foot, taking a route that would pass near the place where he received his wound. When within about one block of the Mint Cafe he met Lannom, the deceased, and recognized (or thought he recognized) him as the one who earlier in the evening had slashed his arm. This meeting occurred at approximately midnight at the intersection of Smith and Beretania streets and under a street light. Five young boys, aged from fifteen to seventeen years, were diagonally across the street intersection from where the defendant and deceased met. These five boys all testified at the trial. Slight discrepancies in their evidence, particularly as to the time they left the skating rink where they had spent the evening, are seized upon by defendant's counsel as indicating the unreliability of their evidence. That argument, however, cannot be considered by us without usurping the function of the jury, which alone is entitled to consider the credibility of the witnesses. It is undisputed—in fact, it is admitted—that the defendant and the deceased met and had an encounter at the place where these five boys say they witnessed it, and four of the five followed the defendant as he left the scene of the encounter. A short distance from the scene they hailed two police officers, who, on information given them by the boys, pursued defendant and arrested him. After his arrest, and as the officers were taking him to the scene of the encounter, a knife with a six-inch blade, and stained with what the police officers say looked like blood, was dropped by the defendant, recovered by the police officers and introduced in evidence. The defendant has never from that time been out of custody. It cannot therefore be said that there is any question of the sufficiency of the evidence to identify the defendant (independent of his own evidence) as the

man who had an encounter with the deceased at the time and under the circumstances testified to by the five boys.

On the question of whether or not the evidence was sufficient to support a finding that the defendant stabbed the deceased, two of the five boys who witnessed the encounter have testified that they saw the defendant strike the deceased and as he delivered the blow they saw the gleam of a knife blade in his hand. The other three boys do not claim to have seen the gleam of the knife but do describe the encounter as being a fight in which the men fell to the ground, got up and continued the fight, after which the deceased again went down and the defendant fled. Before pursuing the defendant the boys crossed the street and observed that the deceased was wounded and bleeding. There was also evidence to the effect that immediately upon his arrest, as hereinabove indicated, the defendant was escorted by the policemen who arrested him to the scene of the encounter. There they found the deceased lying on the ground, suffering from a fresh stab wound in his breast. Other evidence shows that the weapon used penetrated the lower part of his breastbone, diaphragm and liver, and passed downward through two of his ribs, severing them from the breastbone. The deceased was then unable to talk and was bleeding profusely. The police immediately caused him to be removed to the hospital.

One other piece of evidence is seized upon by counsel for the defendant as indicating that there is not satisfactory proof that the wound was inflicted by the defendant. This consists of testimony of some of the five boys that the defendant was accompanied by two other men and when the encounter was over he told them to "scram." However, the defendant denies this and says that he was not accompanied by anyone when he met the deceased. He says that he was on his way to the hospital to get his arm

treated, and when he met the deceased and recognized him as the man who had earlier in the evening cut him with a knife he asked the deceased to take him to a hospital to get his arm treated and that thereupon the deceased threatened to kill him, attacked him and choked him, whereupon the defendant pushed deceased with his hands but denies that he struck or used a knife at all. On this conflicting evidence the jury found defendant guilty of the crime of murder in the first degree. The verdict indicates that the jury disbelieved that part of the defendant's story denying culpability and believed that of the boys who witnessed the encounter. That the wound which Lannom received on the evening in question was a mortal one, from the effect of which he died three days later, is not questioned; in fact, all of the conflicting evidence relates to whether or not it was the defendant who inflicted the wound from which Lannom died, the question of malice aforethought, and the issue of self-defense. On these questions the jury has, upon evidence amply sufficient under the rule, found the defendant did inflict the wound from which death ensued, with malice aforethought, and that he did not act in self-defense.

We have omitted much of the detail of the evidence bearing upon the disputed issues, especially admissions made by the defendant in the signed statement which he gave to the police. We have, we believe, recited sufficient of the evidence to demonstrate that there was ample competent evidence, if believed, to justify the verdict.

*C. E. Hogg* (also on the briefs) for defendant, plaintiff in error.

*W. Z. Fairbanks,* Assistant Public Prosecutor (*C. E. Cassidy,* Public Prosecutor, with him on the briefs), for the Territory.